Case number 22-1748, Jason Kutchinski v. Freeland Community School District, you know, poor Morgan is not conceivable in this case. I'll have to ask Mr. Ellison to make a receipt for me. Good morning. My name is Attorney Philip Ellison. I'm representing the plaintiff on this matter. I'd like to reserve three minutes for the trial. Thank you. Your Honors, I come to this court being the person that didn't ask for oral argument, but yet we are here in oral argument here in beautiful Memphis. But I would start my argument by pointing out that... Some of us are backhanded, but we're happy to have you. Thank you. Well, not that I don't enjoy seeing you guys in Cincinnati, but this is my first trip to Memphis down here. But I guess my question, I start by saying that I think that Leshock and Blue Mountain control the First Amendment outcome of this case. I think Stevenson controls the vagueness outcome of this case. I think those cases are well-thought, well-reasoned, and I think they apply almost directly on point here. Even Leshock, which is the case of the En Bonne Third Circuit case, the facts are nearly analogous here to what happened in this particular circumstance. I think where the error of the court below occurred is grouping together the three boys as if they're one individual. Let me ask you, what do we do with Leshock? Obviously, Leshock, another case you referenced, was decided before Mahandler, which seemed to give us the analysis that we must follow for on-campus speech cases. So what do we do with Leshock at this point? I think Leshock and Blue Mountain, which were both issued the same day by the En Bonne Third Circuit, are still consistent with Mahandler on this. I don't think they overruled them. The Supreme Court came up with, in the Mahanoi case, a slightly different rationale than the lower court did in that case. But it did not overrule or otherwise, and in fact, they actually drew a lot of the language that the lead opinion came up with and that came from Leshock and Blue Mountain. So my position is that they adopted it, or at least largely adopted it, rather than overrule in that respect. I think they're all consistent with each other, and I think you can easily read them that way. What I was just about to say a moment ago was, of course, is I think the error that the lower court did here is, when viewing the way these cases came before the district court judge, we filed, as a plaintiff, a motion for summary judgment for the voids of vagueness. That's all we moved on those grounds. My friend from the other side, they moved for summary judgment on the issue involving both the First Amendment and voids of vagueness. Now, you have to be careful when you're a district court judge, as you have to make sure that you're viewing the facts appropriately on the record in the light most favorable to the non-viewing party. As for the First Amendment claim, the facts that are most favorable to my client is they opened a parodic Instagram account, made the gas pump post, and then shared the password of this private joke to this Instagram account with his two friends, and the two friends were the other ones that made this post. The problem that existed, as I see the district court judge's decision, is that he attributed the actions and speech of the other two boys to my client. Now, I've addressed this in two responses to the court below. One is I used Section 230, which all of a sudden became this hot political issue, because, of course, the Supreme Court took the 230 Internet case about civil liability. Well, but this is civil liability. I mean, it is. I mean, what it does is it creates responsibility in a civil context for minors who are attending school. We are suing that the liability is that the school punished him for his speech, and that the liability that was imposed was the school imposing the 10-day suspension, the permanent record additions, and the other types of punishment that were imposed there. There isn't one. I'm going to be frank with you. There isn't one. It has never been applied that I can find in the school speech context. But what's important about that is most of the 230 litigation has dealt with Internet providers. You know, the Instagram, the Facebook, the actual provider themselves. But the statute actually provides, and this is the point I tried to make, is 230 is not only just the provider. It's the provider or user. And the or user part is something that I can't find another case on point where someone has dealt with that portion of it. It's used by the big tech companies, and the provider part has never been used, or at least I could find used in the school context for the user part. Now, that's the statutory defense, if you will, for that one going forward. The other part of this is you can't make guilt by association in the First Amendment, and that's what I think the case is. Is this an actual disruption case, or is this a potential disruption case? I think they're neither, and the reason why I would point to is the key fact is the bottom of page, and we had a weird citation to this court, of course, because we had to seal the individual transcripts on this. But I would point to the bottom of page 55 of Principal Tracy Smith's deposition. When she was trying to find out what was going on with this Instagram account, the question I asked her is, isn't it really you that's causing the disruption by calling these kids out of the classroom and saying, have you seen this Instagram account? And her response, and I think it's the whole case, and again, you've got to view the facts most favorably. These group of kids don't know anything about it. All the kids that she called out of the classroom knew nothing about that Instagram account. She set the grapevine on fire, not the Instagram account. There are 20 people who are admitted to the, who are joining the account or following the account. I think most of the students are all students. But this was all, apparently... So there's a teacher crying. I mean, the teacher, I haven't even told you who has the teacher crying. There's a teacher crying over this post in front of a classroom of students. That's not disruptive. Well, that facts wall is noted in there. It's not been very well developed in this record. But, I mean, the point is that she was upset. No, no, I'm acknowledging that part of it. But the exact context of what she was crying about, but I want to be very careful, because if you look at her deposition, she wasn't crying about my client's post. She was crying about the two others. The two others. That's the key to this whole case. But your client's the one who set up the account. That's true. He had a fake account in the name of the biology teacher, Stephen Schmidt. That's true. He has this post with a hypodermic needle in the gas pump. Your position is that's not enough for the school to discipline him. For the sake of argument, maybe you're right. But once his two friends start posting these lewd things on that account, and he knows about it, he's joking with him about it. Why is that not enough for a causal nexus, connection, that these may be allowed for their indirect speech, because he's the one who started it and he didn't shut it down until after noon on Monday. Two reasons. Two responses. One is he's not participating in joking with him in that respect. At least I don't think that's been established on this record. He was actually testified in his deposition that he knew nothing about this and didn't condone this and was actually shocked by what he actually had. He saw when his two friends posted this. And by the next day, remember, this was a cradle-to-grave in about a 48-hour Instagram account. What did he think his friends were going to do when he gave them the password to the account? Well, certainly, I give my password to my assistant for accounts, but I don't expect her to do things in an appropriate nature as well. And that's your employee. That's not your friend. That's your fellow high school classmate. Fair enough, but I mean, what would... That's your agent. But however, then, we are then being... What we're doing, then, is we're making the student responsible for the independent speech of three parties. And the Supreme Court... The student enabled the speech. The student created the fake account. The student gave the password to the other students. They talked about it. I mean, he basically set all the wheels in motion. If this is a conspiracy, they'd certainly all be on the conspiracy as a criminal matter. But this is not... I understand. But if you take the principle, they're all in this together in a sense. But he was posting this as a joke. They took it a step too far. And again, but you have to remember, and I guess where I would push back on this analysis is you have to look at the facts most favorable to my client in this juncture. His testimony thus far is that he didn't know about it. He didn't approve it. He didn't condone it. He didn't know what was happening. And by the time he figured out what was going on with it, after the school day started on Monday, he deleted the account himself. He says he didn't know about it until Monday? Well, it's a matter of when he said he knew about it, understanding what exactly the effect of their speech was and who had access. Once he found out who had access to the account, the next morning when the school began investigating all of this, he decided that this was not appropriate, that this speech by third parties was not appropriate. And he voluntarily deleted the account. He knew what K.L. and L.F. had posted on Sunday, did he not? That, I don't know for a record, established exactly when he knew, when he actually knew about those posts. But what I do know, I can say from the record, is by the time he spoke to his friends on Monday morning by lunchtime, again, they had lunch quite early in this particular school system, as you can see from the deposition transcripts, I think it was at 11 o'clock, he deleted that post voluntarily. He deleted that entire account voluntarily, which of course made my job harder later on as a lawyer. But in that respect, once he realized what the effect, or at least the minimum what the effect of that speech that wasn't his was, he took the proactive approach to shut down and completely terminate that speech and communication. It was sort of a diving task in terms of disruption. Well, but then that makes us responsible for the speech and communication. But suppose the district just said, we're going to punish you for creating a fake account about a teacher. I don't care what it says. You've impersonated a teacher online. We're going to suspend you for 10 days because of that. Couldn't the district do that? I don't think so. The reason being is this is all speech that occurred outside of school. This is an off-campus speech case, and that would be so long as the purpose of the actual account, if you will, was to be a parody, which is not a speech at that point. It's just condom. It's just condom at that point. It's not speech. You didn't post anything. Could you create a fake account that maybe people could have joined or something? Why couldn't? It seems like not a great idea to have students create fake social media accounts for their teachers. Well, but in this case, it's our position that this was a parody. This was a joke that was supposed to be done. A parody is protected speech. Under the City of Parma case, Novak v. City of Parma, obviously I am nodding at you when I say that. I would have equated, because I don't like how the outcome of it ultimately came in that case, but the Parma one. That wasn't a student-person and teacher. I agree. I agree in that respect. But I guess the point I'm getting at is that this is all speech that occurred outside of the school, has greater First Amendment protections. I would say it's just condom. There was just condom here and no speech. They didn't punish him for that. Part of the punishment was for creating the account itself. But that would be on violation of the First Amendment, too, if parody is a protected speech. Now, if he was doing it for some nefarious purpose, here the testimony again, viewing the facts most favorable to my side, my client testified that the purpose of this was for not using the word parody. Why does the purpose matter? Our school does not want students creating fake social media accounts for teachers, whether it's for good reasons, bad reasons, funny reasons. Well, taken to the logical extreme, wouldn't it be great if all students didn't speak about their school at all outside of the campus time? We don't allow for that. First Amendment speech is just condom. See, I respectfully disagree in that respect. It could be both, but it feels like they could have punished him just solely for the condom. Maybe that's not what happened. And maybe that might be my response to that, would be in that response. I just finished by saying, again, I want to make sure that the court takes away from this is that the First Amendment portion of this has to be viewed in the light most favorable to my client, and the district court failed to do that. Unless the panel has any other questions. Okay, thank you. Thank you. Thank you. Thank you, Your Honor, and may I please report, this is a First Amendment school speech case. Concerning the bounds of when a school district can act to limit off-campus speech in the wake of the Supreme Court's decision in Mahonoi v. Biala. Freeland School District was entirely justified in punishing the plaintiff for his creation and proliferation of this Instagram account that mimicked a local school teacher and served to harass other school teachers and even his students. Was he punished for the speech or punished for the condom he was creating in a fake account? Your Honor, the record reflects that he was punished for multiple rule violations, some of which included direct speech, as well as rule violations which would implicate a mixture of speech and conduct, as you suggested, to appellant's counsel. So you argue that, you don't really argue that it's just conduct. You don't argue that everything, all the punishment ties in some way to speech, in your mind? Your Honor, we address the speech portion because, of course, that is the most problematic and is what's truly at issue here. However, we do note in some of our briefing both to the lower court and to this court that certain issues such as the challenge to the beingness of Rule No. 10 may be moved because of the fact that he was punished under these other rules. I'm just talking about the posts and the basis for doing so. Certainly. It doesn't seem like he really made that argument. It's helpful to look at this, Your Honor, as sort of a three-step analysis. The first, going directly to that point, can we attribute the full scope of the in-house speech to HK? And the answer to that is yes. And the lower court picked out two perfect seminal on-point cases, that being Doe v. Hopkinton and Kowalski v. Berkley County. The Doe court laid out this causal connection test that asked the question, can an individual participant in group bullying have that total scope be attributed to them for the purposes of school punishment? But in those cases, those individuals either liked a comment, a disparaging comment, or they commented on something, so they did something extra beyond just creating an account. There was something that they seemed to be furthering the bullying that was going on. And, Your Honor, those same factors are present here. Because we have HK not only creating the account, not only creating its perfectly mimicked, down to biographical details about the teacher's family being included in the biography section of the account, but we also have him acquiring knowledge of the posts that were made by the other students, and after that fact, authorizing followers to the account. So when do you say acquired that knowledge? Because your friend on the other side says he didn't acquire that knowledge until lunchtime on Monday. The testimony that was given by the plaintiff's minor was that he was authorizing followers  and by the very nature of that, there had to have been knowledge of these posts because he's accessing that page to give access to these followers up until the point of the eventual termination of the page, which, by the way, was done because another student had commented to him that it had gone too far. So looking at these tests established in Doe and Kowalski, the Kowalski court actually taking and adopting the causal connection test that's laid out in Doe, they just ask the question, is there a causal connection between the speech that was perpetrated by the individual participant to the end outcome of the bullying? So once he sets up the account, anything that happens after that, whether he knows about it or doesn't know about it, he's responsible for it because it's a causal connection, meaning anything that happens after it comes from him setting up that account. Well, certainly in the court we need to identify factors that exceed the mere creation of an account. If I created an account, let's say Memphis FC Fan Club, and then I gave my password to some friends and they started posting terrible things like what's posted here, well, then that may fall short of what is needed. But here we don't have that. We've got, you know, evidence that he knew what was occurring, that he set it up to be an exact duplicate of what would look like a legitimate account, and he's actively allowing followers with knowledge. And that in and of itself rises to the level of the circumstances that the court found in Joe and Kowalski that were sufficient to allow the school to punish for the sum total of the speech. Do you have any knowledge that he acquired this knowledge of what was posted by his two friends on Sunday, for example, the day before school? Your Honor, I believe that would be an inference made from H.K.'s deposition testimony. And that would be, as far as the record has developed in that respect, but certainly it's a very strong inference given the fact that he testified that he authorized these followers over the course. Let's assume that his friends had not posted anything. He just set up this fake account. Would you have any, how would you distinguish the lay shock, the third-degree case? Well, Your Honor, the lay shock case, as well as a few other cases that are cited here in the Doniger v. Meehoff case, and also Kowalski, these are sort of proto-Mahoney cases, right? They're the seeds of these judicial philosophies that eventually grew the tree that produced the fruit that became Mahoney. So those cases, and especially lay shock, which wasn't even developed under a Tinker test argument, are not really that persuasive for me in looking at this because, one, they are not, well, not directly overturned. Mahoney would be the guiding seminal case on this issue. And some of the tests that are employed by the lay shock court in those courts and other decisions have sort of fallen in favor of the steps that are outlined in Mahoney. Once we establish that he can be responsible for this speech under those cases, then we have to turn to the sort of two-part test that's contained in Mahoney. Mahoney directly looks at sort of a standard Tinker test analysis, but also it establishes for other courts a feature test. Here's what you have to look for to see situations in which a school may retain a special interest in regulating off-campus. So Tinker seems to allow the school to act in a constitutional way where there is an actual disruption or a potential disruption. Which one is this case about? Your Honor, frankly, this is about both. Because we have... What did the district court say? The district court agreed with me. They said that... Go ahead. Certainly. Well, they talk about the actual disruption that occurred, including two teachers testifying that they were thrown off their game, so to speak, that they believe that they didn't get all that was required to be done that day completed, and that they weren't given... The district court really seemed to ground its decision in potential disruption. I think it basically seemed to come down to that. I mean, I realize that the facts you're saying are there, but it seems to be grounded in potential disruption.  Can we affirm on any basis? Yes, you can, Your Honor. You can affirm on either basis. Because the court in Lowery v. UBAR has said that school officials have an affirmative duty not only to ameliorate the impacts of disruption, but to prevent it from happening in the first place. They put it in plain English. They say, you don't have to wait for the horse to leave the barn before you close the door. Well, right. I guess the question is whether the horse left the barn here. And you're saying it did, but he or she didn't. It did. The question is, what's the argument here about potential disruption? I mean, this was on Monday. This was all taken care of, basically. At the time that the school officials here were investigating and attempting to figure out what the whole scope of what was even going on, at that point it wasn't known that HK had made the decision to delete the page in question. So with the knowledge that they had before them, they made the necessary investigation to shut down what could have been a growing issue, this page that's made to look like a teacher that several students had clearly taken knowledge of and had even raised red flags themselves to these individuals that this has gone too far, this is not okay. That type of disruption has the potential to snowball to even greater material disruption than had already occurred in the school that day. Do you think the stronger basis is actual disruption or potential for disruption? I would say the stronger basis, I would say, is for the potential for disruption. Although I would say that I don't believe that the actual disruption that occurred is weak in any respect. It far exceeds the limited disruptions that occur, for example, in Blue Mountain or some of these other cases where they found that it wasn't enough of a disruption. We certainly have here both heavily impacted students and teachers, including, as you mentioned, the teacher crying in the middle of the class, which causes a student distress so much that she goes to another teacher to ask what she can do about it. And then collectively referred to the principal, which is creating a disruption in the student, teacher, and administration level of Freeland School District on that day in question. Your Honor, I did want to briefly address counsel's second claim that Rule 9, I'm sorry, Rule 10 is void for vagueness. Frankly, it is not impermissibly vague because it has to be read in context with the other rules in their school handbook. Gross misbehavior has a common definition that's easy to understand. And really, not every statute or rule has to have this prohibition of conduct aspect that plaintiff seems to suggest must be present. There's plenty of rules which don't prohibit specific conduct but rather serve as a procedural or prescriptive rule. Is the gross behavior for everything that took place, or would there be gross behavior just for creating the fake account and making the first post? So, Your Honor, I think the situation that we have here is that the gross misbehavior should be sort of looked at as a sentence-enhancing statute. I've cited Michigan's felony enhancement for official offender statute to show that a situation like this, with this Rule 10, it serves to put on notice to students that if you commit a serious rule violation, you risk expulsion or suspension. And that's the purpose of that rule, just like the purpose of Michigan's felony official offender statute would be, is to set forth a legal mechanism by which the school can protect themselves from, for example, a due process claim saying, I didn't know that I could be suspended or expelled for this particular thing. So I think when you look at the suspension letter that was actually sent, it doesn't say just that he was suspended for gross misbehavior. It says gross misbehavior for, et cetera, et cetera, et cetera. And the et ceteras there are violations of other school rules within the Freeland School Handbook that are not being challenged. But you can say that students can criticize school, or certainly adults, that they can criticize school official, right? Why can't students be critical? They have free speech rights, don't they, especially outside of class? Respectfully, Your Honor, I disagree that the speech here at issue is criticism. In fact, it's harassment. The type of absolute vulgar and lewd things that were posted on that page could, in fact, shock the conscience of basically anybody who read them. I assume, by the way, I don't know what's in the record, I assume the two students who actually posted those things, I assume they were suspended or disciplined in some way? Yes, that's my understanding, is that all three were punished, and the only challenge is coming from H.K., who was not the one who posted the offensive remarks, but the one who set up the attack. Yes. The question really is, is he causally linked to those other two? That's the heart of the issue here. Yeah, I would say that that's the first gate that the Court has to address, and I believe that the Doe and Kowalski courts more than adequately lay out the circumstances which put this Court to find that it needed to have a full scope of the speech attributed to it. Thank you, counsel. Thank you very much, Your Honor. Counsel, you have three minutes for a vote. I would point the Court... We were talking today about conduct versus speech a few moments ago, and actually the tail end of my oral argument. I'd like to point the Court to ECF number 51-15, which is page ID 10-53, and that is the actual August 6th letter that sets forth the guilty determination of the school superintendent, and he found that there was a 10-day suspension appropriate for gross misconduct for his posting a fake Instagram account impersonating a teacher. So not necessarily creating or sharing the passwords on those, or at least that part. It's the actual tools of speech that he's invoking to be able to use for that speech is what he's found to be gross behavior. Then he goes on to say, posting that account as the teacher and sharing a username and password with other students. None of those things are banned or barred under the rules from the student handbook in any way. What this is being done is this is being done as a tool, using Rule 10, to vaguely scoop up speech and scoop up, even if it's content or even it's conduct, if you find it, that is connected to that speech to be able to punish, not for what the actual activity is, but for the speech or the viewpoint that was taken in that respect. I would point the court to Principal Smith's deposition, where I go in great detail. We kind of talk about the drama club versus the Saturday Night Live, and I'm asking some questions and I'm comparing and contrasting the interpretation of these kinds of rules to those circumstances, and what she finally admits is, I don't like the content, the viewpoint that's actually taken. And that's speech. That's the actual challenge to speech, not the conduct of the individual. So I think this is still, while the line between conduct and speech sometimes gets a little blurred, like burning a flag, whether that's conduct or speech, I think this still falls on the speech side for the purposes of this case. I'd also like to respond very briefly, and I only have a minute left, is Ms. Howlson testified during her, she's the English teacher that cried, that, did she cry because of what my client did? And her answer was no, because the question was, did you find the gas pump post offensive in any way? She said, no, that one wasn't appropriate. How do you distinguish these cases from, I think your opposition relied on, Kowalski and maybe the Doe case? I addressed that in the PLN, my primary brief. The problem with that, it goes back to where I started in the top side of this. If this court is prepared to say, when you are part of a group and someone else's speech is attributable to you, then I lose. I mean, I lose in that respect. But never has this court, or any court, ever said that the speech of a third party can be punished against another. That goes to my 230 argument, that goes to the, I cite four or five cases, including the Healy case, that says that the speech, or what I call the association cases, just by the mere fact that you're associating with someone who's violating a rule or the law in some respect, especially in the First Amendment context, we do not punish for that. Now, whether or not the two other boys should be punished, to the extent they should be punished, that's not before you today, and that's certainly not who I'm here to represent. I'm here to represent the very narrow actions that my client took, where I come back to where I started from. He did three actions. Created the account, he posted, and that's it. Unless there's any further questions, I appreciate your time here today. Thank you very much. Thank you. The case will be submitted.